**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 08-cv-00567-CMA

In re:  ALFREDO MANRIQUEZ
         STACY LYNN MANRIQUEZ

FIRST NATIONAL BANK OF OMAHA,

         Appellant,

v.

ALFREDO MANRIQUEZ,

         Appellee.

---

## ORDER REGARDING BANKRUPTCY APPEAL

---

This matter is before the Court on appeal from Bankruptcy Judge Michael E. Romero's Order in Case No. 07-1155.  In that Order, the Bankruptcy Court considered whether certain credit card debts incurred by Appellee Alfredo Manriquez on a credit card issued by Appellant First National Bank of Omaha were dischargeable in bankruptcy.  First National argued that the debts were obtained by fraud and thus not dischargeable.  The Bankruptcy Court disagreed, finding insufficient evidence of Mr. Manriquez's intent to deceive.  On appeal, First National contends that this finding was based on erroneous findings of fact and misstatements of the law.  Taking jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 158, the Court affirms the order of the Bankruptcy Court.

## BACKGROUND

The facts of this case are largely undisputed.  Mr. Manriquez and his wife filed for bankruptcy in late 2006, seeking to have discharged, among other debts, the $6,600 balance on his Visa credit card issued by First National.  This was one of a number of credit cards held by Mr. Manriquez, all of which were used with some regularity.  In the summer and fall of 2006, Mr. Manriquez carried a high balance on most of these cards, often paying only the minimum amount due each month.  Mr. Manriquez was some-times unable to make even these minimum payments; as he testified at trial, bills were paid as he had the resources to pay them.

Even with the use of these credit cards, the Manriquezes' finances grew out of balance.   At the time they filed bankruptcy, the Manriquezes' monthly expenses exceeded their monthly income by $1,300.  Mr. Manriquez testified that the income and expenditure numbers remained "more or less" the same in the months leading up to their bankruptcy.  The one exception was an additional $550 per month in car payments for a Volkswagen Jetta that the Manriquezes purchased just a few months before declaring bankruptcy.

The dispute in this case centers on the charges incurred on the First National credit card in September and October of 2006.  As of September 19, the card had only a $1.75 balance, and a $14,700 credit line.  Between September 19 and October 10, the Manriquezes made $6,350 in new charges to the card.  This included $2,500 for the purchase of a Royal Carribean cruise.  These charges appeared on the credit card's

2

October billing statement, which indicated a $147 minimum payment due by November 8, 2006.  That minimum payment was not made.  Indeed, no additional payments were made on the First National card.

On October 16, 2006, Mr. Manriquez met with a bankruptcy attorney and paid him a $1,300 cash retainer.  The attorney prepared the necessary paperwork and, on November 9, faxed that paperwork to the Manriquezes for their signature.  The bankruptcy petition was filed in mid-December 2006.

In March 2007, First National filed a complaint seeking to prevent the credit card debt from being discharged.  If First National prevailed, it would mean that Mr. Manriquez would still be responsible for the credit card debt notwithstanding his bankruptcy.  First National argued that the debt was nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), which excepts from discharge debts obtained by fraud, and 11 U.S.C. § 523(a)(2)(C), which excepts debts for "luxury goods."  The Bankruptcy Court held a trial on February 13, 2008, after which it issued findings of fact and conclusions of law.  As to the Royal Carribean cruise, the Bankruptcy Court found that this was a purchase of a luxury good and thus the debt was not absolved by the bankruptcy filing. (Order at 5-8.)  As to the remaining debt, however, the Bankruptcy Court found that it was dischargeable.  While the use of the card was an implied representation that Mr. Manriquez intended to repay the debt, and while this representation was proved false by virtue of his filing for bankruptcy, the Bankruptcy Court found that the evidence, on balance, did not show the requisite fraudulent intent when the representations were

made.  (Order at 2-5.)  Thus, except for the $2,500 for the purchase of the cruise, the credit card debt was discharged.  (Order at 8.)  First National appeals that ruling.

## DISCUSSION

## I.    LEGAL STANDARDS

Generally, a party dissatisfied by a bankruptcy court's decision may appeal that decision to either the district court or a bankruptcy appellate panel.  28 U.S.C. § 158. This Court, therefore, sits as an appellate court, reviewing the Bankruptcy Court's factual determinations for clear error and its legal conclusions de novo.  *Taylor v. I.R.S.*, 69 F.3d 411, 415 (10th Cir. 1995).  As the party challenging the Bankruptcy Court's order, First National has the burden of demonstrating error.  *In re Winslow*, 121 B.R. 598, 599 (Bankr. D. Colo. 1990).

First National does not challenge the Bankruptcy Court's ruling on the luxury goods exception, but does seek reversal of the decision that the remaining debt was not dischargeable pursuant to the fraud exception, Section 523(a)(2)(A).  To establish nondischargeability under that section, a creditor must prove: (1) the debtor made a false representation; (2) that representation was made with the intent to deceive; (3) the creditor relied on the representation; (4) the creditor's reliance was reasonable; and (5) the creditor suffered a loss therefrom.  *See, e.g.*, *Fowler Bros. v. Young* (*In re Young*), 91 F.3d 1367, 1373 (10th Cir. 1996).  First National's appeal focuses primarily on the second, intent to deceive element, and specifically challenges both the

4

Bankruptcy Court's findings of fact and its conclusions of law.  The Court considers these issues in turn.

## II.    THE BANKRUPTCY COURT'S FACTUAL FINDINGS ARE NOT CLEARLY ERRONEOUS.

In reviewing factual findings, the question is not whether this Court would have weighed the evidence differently were it sitting as the trier of fact.  *Sec. Investor Prot. Corp. v. Stellatos* (*In re Blinder, Robinson & Co.*), 124 F.3d 1238, 1241 (10th Cir. 1997). Rather, "[a] finding of fact is clearly erroneous only if the court has 'the definite and firm conviction that a mistake has been committed.'" *Gillman v. Scientific Research Prod. Inc.* (*In re Mama D'Angelo, Inc.*), 55 F.3d 552, 555 (10th Cir. 1995) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).  "'It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data.'" *Id.* (quoting *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir. 1972)). In short, "[i]f the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety, the [district court] may not reverse it . . . . [T]he factual findings need not be correct, but [the court] must uphold them if they fall within the range of permissible conclusions." *In re Blinder*, 124 F.3d at 1241 (quotations, citations, and alterations omitted).

First National does not directly attack the Bankruptcy Court's factual conclusion that Mr. Manriquez acted without fraudulent intent.  Rather, First National takes issue

with a number of subsidiary findings that undergird that conclusion.  First National

devotes most of its argument to two specific findings.  First, it argues that the

Bankruptcy Court erred in finding that "[i]n September 2006, Manriquez testified that

he had made a payment or partial payment on each of his credit cards and that

during the time period he incurred the disputed [First National] charges he had always

intended to repay First National."  (Doc. # 12 at 15-17.)  First National contends that

Mr. Manriquez's credit card statements do not support this testimony.  But while there

is room to quibble over the precise timing of the payments, the Bankruptcy Court's

statement is not flatly wrong.  Mr. Manriquez paid some, though not all, of the monthly

minimum payment on his Citi credit card on September 15, 2006.  (Doc. # 15-5 at 20.)

Similarly, Mr. Manriquez paid the monthly minimum on his Discover card for the bill due

September 4, although the payment itself was made in August.  (Doc. # 15-6 at 14-15.)

He made the minimum payment on his 1st Financial card, paying $239 on September

12.  (Doc. # 15-8 at 18-19.)    Both his Sears and Wells Fargo cards were paid in late

August.  (Doc. # 15-11 at 24; Doc. # 15-12 at 6.)  He even made a payment on his First

National card, on September 12, albeit before he began incurring the charges now in

dispute.  (Doc. # 15-7 at 55.)  In light of this evidence, the Bankruptcy Court's crediting

of Mr. Manriquez's testimony is not clearly erroneous.

Second, First National challenges the Bankruptcy Court's finding that "[t]he

length of time between when Manriquez began incurring the disputed charges and

when the Debtors filed their bankruptcy petition was 88 days or approximately three

months."  (Doc. # 12 at 18-19.)  First National argues that referring only to the date of

the first charge, rather than the date of the last charge, "presents at best, an incomplete

picture."  (*Id.*)  However, First National does not argue that the Bankruptcy Court's

calculation of the gap between the initial charge and the bankruptcy filing is incorrect.

Nor does First National point to any case law suggesting the Bankruptcy Court was

required to reference the date of the last charge.  Again, this Court is not to consider

how it would have weighed the evidence had it been the finder of fact; the Court's role is

merely to determine whether the finding is "within the range of permissible conclusions."

*In re Blinder*, 124 F.3d at 1241.  It is.[1]

In addition to these two specific challenges, First National cursorily complains

about a number of other findings, such as the Bankruptcy Court's statement that

Mr. Manriquez's credit limit on the First National card was more than twice the amount

charged, that many of the charges were for necessities such as food and gas, and that

the First National charges did not evidence a sudden change in spending habits.  (Doc.

# 12 at 20-21.)  For each of these findings, First National basically disputes the

Bankruptcy Court's interpretation of and conclusions from the evidence.  The problem

with First National's argument is that it shows, at best, that the Bankruptcy Court could

---

[1]   First National appears to dispute whether the relation of the charges and the bank-
ruptcy filing should be relevant at all, arguing that "knowledgeable bankruptcy counsel" will
often delay a bankruptcy filing to create a gap in the timing.  (Doc. # 12 at 19.)  However, the
length of time between charges and filing has expressly been held relevant to the question of
a debtor's fraudulent intent.  *See, e.g.*, *Chevy Chase Bank FSB v. Kukuk* (*In re Kukuk*), 225
B.R. 778, 786 (10th Cir. B.A.P. 1998).

have come out differently, not that its conclusions were wholly implausible or totally devoid of support.  That is not sufficient to demonstrate clear error.

Finally, First National points to a number of facts that, it contends, the Bankruptcy Court did not mention in its analysis: Mr. Manriquez's meetings with financial counselors during the time he was making charges on his First National card; Mr. Manriquez's college education; the fact that Mr. Manriquez never made a payment on the First National card after incurring the charges in September/October 2006; Mr. Manriquez's charges on other credit cards at or around the same time he was incurring charged on the First National Card; and Mr. Manriquez's purchase of a new car in August 2006. (Doc. # 12 at 20-22.)  This argument is essentially a claim that the Bankruptcy Court's failure to expressly discuss each and every subsidiary fact rises to the level of clear, reversible error.  That is not the law.  While a bankruptcy court must make findings "sufficient to indicate the factual basis for the ultimate conclusion," it need not make "inordinately detailed findings."   *Colo. Flying Acad., Inc. v. United States*, 724 F.2d 871, 877-78 (10th Cir. 1984).[2]   The Bankruptcy Court discussed the facts relevant to Mr. Manriquez's intent to defraud, citing facts both positive and negative to Mr. Manriquez. (Order at 3-4.)  It specifically observed that Mr. Manriquez's "overall financial condition at the time charges were made was not good," pointing out the negative monthly income of $1,300, and also noted First National's argument that "only a few days after

---

[2]   *Colorado Flying Academy* specifically discusses Federal Rule of Civil Procedure 52. However, the bankruptcy rules apply Rule 52 to findings by a bankruptcy court in an adversary proceeding.  Fed. R. Bankr. Proc. 7052.

making the final purchase" on the First National card, Mr. Manriquez retained

bankruptcy counsel.  (Order at 2, 3-4.)  The Bankruptcy Court's order provides a

sufficient basis to support its ultimate conclusion and is not clearly erroneous.

## III.   THE BANKRUPTCY COURT DID NOT ERR IN ITS LEGAL CONCLUSIONS.

First National's second line of attack is to challenge the Bankruptcy Court's

conclusions of law.  First National's arguments are at times a bit hard to follow, as much

of its brief on appeal was lifted wholesale from pre-trial filings and the arguments often

were not updated to reflect the Bankruptcy Court's ruling.  However, First National does

specifically reference four legal conclusions that it contends were in error, which the

Court will address.  As explained below, First National's challenges are little more than

disagreements with the Bankruptcy Court's particular articulation of the relevant legal

construct.  They fail to point to any true error of law that would compel this Court to

disturb the Bankruptcy Court's decision.

### A.   "Exceptions to Discharge" Standard

In outlining the basic workings of Section 523(a)(2)(A), the Bankruptcy Court

cited the Tenth Circuit's decision in *Bellco First Fed. Credit Union v. Kaspar* (*In re*

*Kaspar*), 125 F.3d 1358 (10th Cir. 1997), for the principle that "[e]xceptions to discharge

are to be narrowly construed and any doubts must be resolved in the debtor's favor."

(Order at 2.)  First National challenges this statement, contending it is in conflict with

recent Supreme Court precedent that seeks to protect, in bankruptcy, only the "honest

but unfortunate" debtor.  (Doc. # 12 at 24-25.)

9

In *In re Kaspar*, the Tenth Circuit considered whether a computer-generated statement provided in a credit application was sufficient to constitute a "writing" for the purpose of Bankruptcy Code Section 523(a)(2)(B), which excepts from discharge debts obtained by a false written statement of financial condition.  125 F.3d at 1359.  The court "start[ed] [its] analysis with the recognition of the rule that exceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor."  *Id.* at 1361.  As support for this proposition, the Tenth Circuit cited *In re Hunter*, 780 F.2d 1577 (11th Cir. 1986), which in turn relied on the Supreme Court's decision in *Gleason v. Thaw*, 236 U.S. 558 (1915).  125 F.3d at 1361.  The *Gleason* case addressed the question of whether a debt for **services** obtained by fraud was excepted from discharge under the then-operative provision of the Bankruptcy Code excepting only "liabilities for obtaining **property**" by fraud.  236 U.S. at 558-59 (emphasis added).  While the Supreme Court acknowledged the policy reasons for extending the exception to services, the Court declined to do so, noting that "[i]n view of the well-known purposes of the bankrupt law, exceptions to the operation of a discharge thereunder should be confined to those plainly expressed."  *Id.* at 562.  *Gleason*, and in turn *In re Kaspar*, recognized that a court should always be mindful of the Bankruptcy Code's interest in permitting a debtor a "fresh start" in his affairs, and should seek to interpret exceptions to discharge accordingly.

First National argues that the *In re Kaspar* principle is inconsistent with the Supreme Court's recent decisions in *Cohen v. De la Cruz* (*In re Cohen*), 523 U.S. 213

(1998), and *Grogan v. Garner*, 498 U.S. 279 (1990).  In *Grogan*, the Supreme Court

considered the appropriate burden of proof for exceptions to dischargeability of debts in

bankruptcy.  498 U.S. at 280-81.  Several of the circuits, including the Tenth Circuit,

imposed a clear and convincing standard – a creditor could not successfully prevent

discharge of a debtor's obligations unless it proved, by clear and convincing evidence,

that the debt was obtained by fraud.  *Id.* at 282-83.  The Supreme Court rejected this

heightened standard, determining that Congress intended only that a creditor prove

fraud by a preponderance of the evidence.  *Id.* at 291.

Of particular relevance to this case, the lower court in *Grogan* had articulated, as

a reason for imposing a heightened burden of proof, that "the general 'fresh start' policy

that undergirds the Bankruptcy Code militated in favor of a broad construction favorable

to the debtor."  *Id.* at 283.  The Supreme Court was "unpersuaded" by this argument,

holding that, while a central purpose of the Code was certainly to give debtors a fresh

start, that purpose applies only to the "honest but unfortunate debtor."  *Id.* at 286-87.

The Supreme Court further reasoned that Congress, in excluding from discharge certain

categories of debt (*e.g.*, debts obtained by fraud), "evidently concluded that the

creditors' interest in recovering fully payment of debts in these categories outweighed

the debtors' interest in a complete fresh start."  *Id.* at 287.

The Supreme Court reiterated this point in *In re Cohen*, noting that "[t]he

Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on

account of their fraud, embodying a basic policy animating the Code of affording relief to

an 'honest but unfortunate debtor.'"  523 U.S. at 217 (quoting *Grogan*, 498 U.S. at

287)).  The *Cohen* Court went on to explain that "Section 523(a)(2)(A) continues [this]

tradition, excepting from discharge" debts obtained by fraud or false pretenses.  *Id.* at

217-18.

First National appears to read the Supreme Court's "honest but unfortunate

debtor" analysis as essentially trumping the *In re Kaspar* "narrow construction" principle

derived from *Gleason*.  Admittedly, there is some tension between the two.  Too narrow

a construction to the exceptions listed in Section 523(a), and particularly the fraud

exception, could run the risk of absolving a dishonest debtor of his fraudulently obtained

debt.  On the other hand, too broad a reading of the discharge exceptions could place

such an onerous burden on a debtor as to deprive him of his chance at a fresh start.

However, that tension exists does not mean that one principle necessarily

destroys the other.  There is nothing in either *Grogan* or *Cohen* that explicitly overrules

*Gleason* or declares an end to the "fresh start" policy or "narrow construction" principle.

Tellingly, in *Grogan*, the Supreme Court did not disavow the importance of providing a

debtor a fresh start, but rather emphasized that this policy must be considered in light of

the Bankruptcy Code's other important aim of giving a fresh start only to the honest

debtor.  498 U.S. at 286-87.  Indeed, the Supreme Court reiterated its adherence to

*Gleason* in a decision issued only weeks before Cohen.  In *Kawaauhau v. Geiger*, 523

U.S. 57 (1998), a unanimous court rejected a broad construction of another portion of

Section 523(a), finding that such a construction "would be incompatible with the

12

'well-known' guide that exceptions to discharge 'should be confined to those plainly expressed.'" *Id.* at 62 (quoting *Gleason*).  For these reasons, the Court declines to interpret *Grogan* or *Cohen* as having quietly overruled the principles announced nearly a decade ago in *Gleason*.  *Cf. Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("[W]e do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent.  We reaffirm that 'if a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.'" (quoting *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989))).

Moreover, there is nothing in the Bankruptcy Court's order to suggest that it impermissibly applied the "narrow construction" rule in a way that ran afoul of the "honest but unfortunate debtor" corollary.  The Bankruptcy Court correctly cited *Grogan*'s "preponderance of the evidence" burden of proof.  (Order at 2.)  It did not interpret Section 523(a)(2)(A) in such a way as to give a dishonest debtor some advantage.  In fact, there is no indication that the "narrow construction" doctrine played any substantive role in the Bankruptcy Court's decision; besides citing the policy in the preamble to the Section 523(a)(2)(A) analysis, it is not mentioned again in the order. The mere invocation of the "narrow construction" principle was not reversible legal error.

**B.    "Reckless Indifference" as Proof of Intent to Deceive**

In analyzing whether Mr. Manriquez acted with intent to deceive, the Bankruptcy Court noted that a debtor's intent must be determined from the totality of the circumstances.  (Order at 3.)  The Bankruptcy Court specifically looked to twelve "non-exclusive" factors that are helpful in that determination.  (Order at 3 (citing *In re Kukuk*, 225 B.R. at 785-87).)  First National complains that the Bankruptcy Court erred by not expressly stating that "reckless indifference" to the truth of a representation can also establish intent to deceive.  (Doc. # 12 at 26-31.)

Proof of a debtor's actual intent to deceive a creditor is crucial to invoking the fraud exception.  *See, e.g.*, 4 Collier on Bankruptcy ¶ 523.08[6] ("A debtor's lack of actual intent to deceive the creditor will result in the discharge of the credit card charges incurred.").  However, as the debtor will rarely admit such an intent, the Tenth Circuit has held that intent to deceive may be inferred from the totality of the circumstances. *In re Young*, 91 F.3d at 1375.  One way to approach this totality analysis is, as the Bankruptcy Court did, to reference a list of non-exclusive factors relating to the debtor's use of the credit card as a proxy for the intent element.  *See, e.g.*, *In re Kukuk*, 225 B.R. at 786 ("Numerous courts have applied the following nonexclusive list of factors to determine a debtor's intent under the totality of the circumstances test for the purposes of § 523(a)(2)(A) . . . .").[3]  Another permissible approach, and the one urged by First

---

[3]   As the Bankruptcy Court correctly stated, those factors are:

(1)    the length of time between the charges made and the filing of bankruptcy;

National in this case, is to consider the debtor's "reckless disregard of the accuracy of the facts" as supporting an inference of intent. *Driggs v. Black* (*In re Black*), 787 F.2d 503, 506 (10th Cir. 1986), abrogated in part on other grounds, *Grogan*, 498 U.S. at 283 & n.7.   Such a finding must be "very narrowly interpreted," however, as "[t]here must be some indication as a whole that 'presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.'" *FTC v. Abeyta* (*In re Abeyta*), 387 B.R. 846, 854 (Bankr. D.N.M. 2008) (quoting *Groetken v. Davis* (*In re Davis*), 246 B.R. 646, 652 (10th Cir. B.A.P. 2000), *aff'd in part and vacated in part* by 35 F. App'x 826

---

(2)    whether the debtor consulted an attorney regarding bankruptcy prior to the charges being made;

(3)    the number of charges made;

(4)    the amount of the charges;

(5)    the financial condition of the debtor at the time the charges were made;

(6)    whether the charges were above the credit limit of the account;

(7)    whether the debtor made multiple charges on any given day;

(8)    whether or not the debtor was employed;

(9)    the debtor's employment prospects;

(10)   the debtor's financial sophistication;

(11)   whether there was a sudden change in the debtor's buying habits; and

(12)   whether the purchases were made for luxuries or necessities.

*In re Kukuk*, 225 B.R. at 786.

(10th Cir. May 24, 2002)).  In any event, First National is correct that reckless disregard

can, in certain circumstances, rise to the level of proving intentional deceit.

The error in First National's argument stems from the assumption that the failure

to specifically discuss reckless indifference rises to the level of reversible legal error.

Reckless indifference, like the other factors discussed by the Bankruptcy Court, is a tool

for inferring intentional deceit.  It is that ultimate issue, and not the subsidiary factors,

that a bankruptcy court must address.  As the Tenth Circuit Bankruptcy Appellate Panel

has explained, albeit in an unpublished decision,

> the question of whether [the] [d]ebtor acted with a reckless disregard of
> the facts is not an element of a § 523(a)(2)(A) claim, but is instead simply
> a means of proving fraudulent intent by inference.  As a result, the
> bankruptcy court was not required to make any specific factual findings
> regarding [the] [d]ebtor's alleged recklessness.  Instead, the court was
> only required to determine the ultimate factual issue of whether [the
> creditor] proved that [the] d]ebtor acted with the requisite fraudulent intent
> . . . .

*Cobra Well Testers, LLC v. Carlson* (*In re Carlson*), Nos. 06-8158, WY-06-027, 2008

WL 193232, *4 (10th Cir. B.A.P. Jan. 23, 2008).  The Court agrees with this analysis;

the critical issue in any 523(a)(2)(A) case is not which particulars for proving intent are

invoked, but rather whether the requisite intent exists.

In this case, the Bankruptcy Court engaged in a thorough analysis of the totality

of the circumstances regarding Mr. Manriquez's intent and found deceptive intent to be

lacking.  (Order at 3-5.)  The Bankruptcy Court did not hold that reckless indifference

was not relevant to that inquiry – that would be legal error.  Rather, in conducting its

analysis, the Bankruptcy Court simply did not mention the phrase.  As "reckless

indifference" is not an element with independent force, but rather is a means to the end of assessing a debtor's intent, omission of a "reckless indifference" analysis is not grounds for reversing the Bankruptcy Court's decision.

### C.   Use of Credit Card as an Implied Representation of Ability to Pay

First National also challenges the Bankruptcy Court's ruling that, while use of a credit card gives rise to an implied representation that the debtor **intends** to repay the charges, it does not impliedly represent that the debtor has the **ability** to pay. (Order at 3.) First National contends that Mr. Manriquez's use of the credit card should be deemed a representation as to both intent and ability. (Doc. # 12 at 31-38.)

The question of what, if any, representations a debtor makes by the simple act of using a credit card has vexed the courts. Some have endorsed First National's position – that use is an implied representation of an intent and an ability to repay the charges. *See Household Credit Servs. v. Melton* (*In re Melton*), 217 B.R. 869, 875 (Bankr. D. Colo. 1998) (citing cases). However, the Tenth Circuit's Bankruptcy Appellate Panel, in a thoughtful opinion, rejected the argument that use implied ability to repay:

> [A]n implied representation regarding the debtor's ability to repay is not grounds for nondischargeability under § 523(a)(2)(A). In particular, § 523(a)(2)(A) expressly modifies the common law definition of "false misrepresentation" by exempting "statement[s] respecting the debtor's or an insider's financial condition[.]"  11 U.S.C. § 523(a)(2)(A) . . . . Thus, we hold that, for purposes of dischargeability under § 523(a)(2)(A), the use of a credit card creates an implied representation that the debtor intends to repay the debt incurred thereby, but does not create any representation regarding the debtor's ability to repay the debt.

*In re Kukuk*, 225 B.R. at 785 (additional citations omitted); *see also Anastas v. Am. Savings Bank* (*In re Anastas*), 94 F.3d 1280, 1285 (9th Cir. 1996) (cited favorably in *Kukuk*) ("We emphasize that the representation made by the card holder in a credit card transaction is not that he has an **ability** to repay the debt; it is that he has an **intention** to repay.  Indeed, section 523(a)(2) expressly prohibits using a non-written representation of a debtor's financial condition as a basis for fraud.") (emphasis in original).  Other courts in the Tenth Circuit have followed this analysis, *see, e.g.*, *Sw. Fin. of Alamogordo, Inc. v. Valdez* (*In re Valdez*), No. 05-1043, 2007 WL 1160357, *4 (Bankr. D.N.M. April 17, 2007), and this Court does so as well.

First National notes that its card member agreement expressly provides that "[e]ach time you use your account, you are representing that you intend, **and have the ability**, to repay all amounts due on your account."  (Emphasis added.)  First National asserts, with little argument, that this statement somehow alters the *In re Kukuk* principle.  (Doc. # 12 at 31.)  However, First National points to no case discussing the effect of such an express term in a card member agreement; rather, First National cites to cases, from other jurisdictions, that deal with the implied representation theory.  (Doc. # 12 at 32-38.)  Without any legal support for, or detailed discussion of, the relevance of its card member agreement, First National has not met its burden to prove that the Bankruptcy Court's decision was in error.  *In re Winslow*, 121 B.R. at 599.[4]

---

[4]   Unlike Section 523(a)(2)(A), Section 523(a)(2)(B) does permit an exception to discharge where there is a **written**, fraudulent statement "respecting the debtor's or an insider's financial condition."  The First National card member agreement is in writing.  However, First

But even assuming that the provision in the card member agreement somehow

constituted an express representation of ability to repay, *cf. Compass Bank v. Meyer*

(*In re Meyer*), 296 B.R. 849, 859 (Bankr. N.D. Ala. 2003) ("Credit card transactions are

governed by contractual agreements between the debtors and the card issuers. . . .

In using a credit card, a debtor represents only that he intends to abide by that

agreement, and has made a false representation only if, at that time the debt is

incurred, he intends to breach his agreement."), First National's argument still fails.

In order to except a debt from discharge under Section 523(a)(2)(A), there must not only

be a fraudulent representation, but justifiable reliance on that statement by the creditor.

*In re Young*, 91 F.3d at 1373.  First National could not justifiably rely on a statement

that, each time Mr. Manriquez used his credit card, he had "the ability[ ] to repay all

amounts due on [his] account."  As aptly explained by the *In re Kukuk* court,

> it is well-known that credit cards are marketed by issuers and often used
> by consumers because they lack the ability to pay at the time that they use
> the card. [*In re*] *Rembert*, 141 F.3d [277,] 281 [6th Cir. 1998].  Thus,
> sophisticated credit card issuers cannot justifiably rely on a representation
> that a debtor has the ability to repay at the time that he or she uses the
> card.  *See Field* [*v. Mans*], 516 U.S. [59,] 70-71 [1995] (defining "justifiable
> reliance"); *see also* [*In re*] *Kountry Korner* [*Store*], 221 B.R. [265], 274
> [N.D. Okla. 1998] (discussing lack of justifiable reliance on the part of
> credit card issuers, the court stated: "To . . . accuse a customer with fraud
> for using the card exactly in the manner the Bank permitted, and, in fact,
> encourages, is audacious, oppressive and hypocritical."); *Chevy Chase
> Bank v. Briese* (*In re Briese*), 196 B.R. 440, 448 (W.D. Wis. 1996)
> ("[P]eople use credit cards precisely because they do not have a present

---

National expressly brought its claims under 523(a)(2)(A).  The Court passes no judgment on
whether a creditor could successfully invoke Section 523(a)(2)(B) in the face of a written card
member agreement.

ability to pay.  It is exactly this reality which makes the credit card industry so profitable, and it is why credit card companies often advertise their cards as just the thing to use in an 'emergency.'"")).

225 B.R. at 785.

For these reasons, the Court finds no legal error in the Bankruptcy Court's

holding that Mr. Manriquez's use of the card represented only an intent, not an ability,

to repay his debt.

**D.    Costs**

Finally, First National contends that the Bankruptcy Court erred in not awarding

it interest, costs, and disbursements.  (Doc. # 12 at 38-39.)  First National's argument

appears to be that, if this Court reverses the Bankruptcy Court's decision, First National

would be a "prevailing party" and thus entitled to its costs.  As there was no error in the

Bankruptcy Court's order, this argument cannot prevail.

### CONCLUSION

Based on the foregoing, the Court ORDERS that the Bankruptcy Court's decision

is AFFIRMED.

DATED:  September   17  , 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge